

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**FELONY**

BILL OF INFORMATION FOR
HEALTH CARE FRAUD

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 23-00219 |
| v. | * | SECTION: SECT. 5 MAG. 4 |
| ALEX LEV GLOTSER | * | VIOLATION: 18 U.S.C. § 1347 |

\* \* \*

The United States Attorney charges that:

## COUNT 1

**A.   AT ALL TIMES RELEVANT HEREIN:**

### The Medicare Program

1. The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits and was separated into different program "parts," including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covered outpatient physician services, such as office visits, minor surgical procedures, laboratory services, and durable medical equipment ("DME"), when certain criteria were met.

4. Medicare "providers" included physicians, independent clinical laboratories, and other health care providers who provided services to beneficiaries. To bill Medicare, a provider was required to submit a Provider Enrollment Application to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5. A Medicare "provider number" was assigned to a provider upon approval of the Provider Enrollment Application. A provider that obtained a Medicare provider number was able to file claims with Medicare to obtain reimbursement for benefits, items, or services rendered to beneficiaries. When seeking reimbursement from Medicare for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a

description and the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System.

6. When submitting claims to Medicare for reimbursement, providers certified that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, were medically necessary.

7. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

8. Medicare would not reimburse providers for claims that were not medically reasonable or necessary, or procured through the payment of kickbacks and bribes.

**Durable Medical Equipment**

9. DME was reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces"), as well as orthotic sleeves.

10. Medicare would pay claims for the provision of DME only if the equipment was ordered by a provider, was reasonable and medically necessary for the treatment of the diagnosed and covered condition, and was actually provided to beneficiaries.

## Cancer Genetic Testing

11. Except for limited statutory exceptions, Medicare only reimbursed clinical laboratories for tests that were "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Further, to be reimbursable by Medicare, "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a).

12. Cancer genetic tests ("CGx" tests) were laboratory tests that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Genetic testing did not determine whether an individual had a disease, such as cancer, at the time of the test.

13. To conduct genetic testing, a laboratory had to obtain a DNA sample from the patient. Such samples were typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The genetic sample was then submitted to the laboratory to conduct the tests. Tests could then be run on different groups or "panels" of genes. Genetic testing typically involved multiple laboratory procedures that could result in billing Medicare using certain billing codes, each with their own reimbursement rate.

14. Because genetic testing did not diagnose diseases or conditions, Medicare only covered such tests in limited circumstances, including where the genetic testing was ordered by a physician in treating a beneficiary's cancer or to inform a beneficiary's drug therapy, and the results were used in the management of the beneficiary's cancer or drug therapy.

### Telemedicine

15. Telemedicine was a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

16. Telemedicine companies provided telemedicine, or telehealth services, to individuals by hiring doctors and other health care providers. In order to generate revenue, telemedicine companies typically either billed insurance or were paid directly by patients.

17. Medicare Part B covered expenses for specific telehealth services if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a provider's office or a specified medical facility—not at the beneficiary's home—during the telehealth service with a remote provider. In or around March 2020, in response to the COVID-19 pandemic, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural or health professional shortage area and allow services to be furnished to beneficiaries in their home.

### The Defendant

18. **ALEX LEV GLOTSER** ("**GLOTSER**"), age 36, a resident of Metairie, Louisiana, was a medical doctor licensed to practice medicine in Louisiana until 2021. In 2017, **GLOTSER** applied for and obtained a Medicare provider number, and in doing so, agreed to abide by all of the terms, laws, and regulations of Medicare.

19. **GLOTSER** worked as an independent contractor for various purported telemedicine companies (the "telemedicine companies").

**B.     THE SCHEME:**

20.     **GLOTSER** and others agreed to execute and executed a scheme whereby they submitted and caused to be submitted over $5.6 million in false and fraudulent claims to Medicare for medically unnecessary DME and CGx testing, of which Medicare paid over $2.4 million.

21.     Specifically, **GLOTSER** ordered knee braces for beneficiaries that were medically unnecessary, including for beneficiaries whom he had not examined and who had not been examined by any licensed physician. Additionally, **GLOTSER** ordered CGx testing for beneficiaries despite not being the treating physician for the beneficiaries, not using the test results in any treatment of the beneficiaries, and not conducting a proper telemedicine visit or consultation with the beneficiaries. These orders for DME and CGx testing, as **GLOTSER** knew, were not the product of a doctor-patient relationship and examination, were medically unnecessary, and were ineligible for Medicare reimbursement.

**C.     THE MANNER AND MEANS:**

22.     The manner and means by which the defendant sought to accomplish the object of the scheme included, among others, the following:

    a.     **GLOTSER** falsely certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare and would not violate the Federal Anti-Kickback Statute. Despite this certification, **GLOTSER** proceeded to violate Medicare rules and regulations and knowingly submitted and caused the submission of false and fraudulent claims, as described below.

    b.     Call centers and other companies advertised, through television, internet, telephone, and direct mailings, in the United States, including in the Eastern District of Louisiana,

that beneficiaries were eligible to receive DME and CGx testing at low or no cost to the beneficiaries.

c. Beneficiaries, including those located in the Eastern District of Louisiana, spoke with representatives of call centers and other companies that solicited beneficiaries, through high-pressure sales tactics, to receive a variety of items and services that beneficiaries neither wanted nor needed. Call center representatives typically indicated that a provider would be in contact with the beneficiaries to further discuss with beneficiaries the items provided.

d. Upon beneficiaries providing personal information, including their names and unique Medicare identification numbers, to representatives of the call centers, the call centers, in turn, provided that information to the telemedicine companies.

e. The telemedicine companies paid providers to order DME and CGx testing for beneficiaries, regardless of medical necessity. Providers gained access to beneficiary information for thousands of beneficiaries from the telemedicine companies in order to sign orders for DME and CGx testing for those beneficiaries. Routinely, providers did not contact the beneficiaries. Instead, often without examining the beneficiaries and determining medical necessity, via telemedicine or otherwise, and in exchange for referral fees, providers ordered DME and CGx testing for beneficiaries that was not medically necessary ("fraudulent orders").

f. **GLOTSER**, for his part, solicited and received payment in exchange for electronically signing fraudulent orders for DME and CGx testing, including for beneficiaries located in the Eastern District of Louisiana, regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship with the beneficiaries, without a physical examination, and frequently based solely on a short telephone conversation or no conversation at all.

  g. **GLOTSER** further concealed and disguised the scheme by preparing or causing to be prepared false and fraudulent documentation certifying that he was the beneficiaries' "treating physician," he had "personally" examined patients, including performing certain in-person procedures for knee braces, and that he used the DME and CGx tests ordered for the "management" of the patients' conditions when, in fact, **GLOTSER** never saw the beneficiaries face-to-face; had either a brief telephone conversation with these beneficiaries or none at all; and did not conduct the examinations and diagnostic tests.

  h. **GLOTSER** caused false and fraudulent claims to be submitted to Medicare for items and service purportedly rendered to such beneficiaries.

  i. Purported telemedicine companies, in turn, provided the fraudulent orders to DME suppliers and clinical laboratories located across the United States, including in the Eastern District of Louisiana, to supply the DME and conduct the CGx testing.

  j. In exchange for the fraudulent orders authorizing medically unnecessary DME for beneficiaries, **GLOTSER** received approximately $270,570 in illegal kickbacks and bribes from telemedicine companies, knowing that his orders for medically unnecessary DME and CGx testing would be used to support false and fraudulent claims to Medicare.

**E.** **THE OFFENSE:**

  23. From in or around September 2017, and continuing through in or around August 2019, in the Eastern District of Louisiana, and elsewhere, **GLOTSER** caused the submission of approximately $5,618,879 in false and fraudulent claims to Medicare for DME and CGx testing that was medically unnecessary, procured through the payment of illegal kickbacks and bribes, and ineligible for reimbursement. Medicare paid approximately $2,420,100 for these claims.

24. On or about October 22, 2018, in the Eastern of Louisiana, and elsewhere, the defendant, **ALEX LEV GLOTSER**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, and aided and abetted others in executing, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, in connection with an order for a left knee brace for beneficiary K.S., with a billed amount of approximately $880.41 and a paid amount of approximately $687.37.

In violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF FORFEITURE

1. The allegations of Count 1 are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2. As a result of the offenses alleged in Count 1, the defendant **ALEX LEV GLOTSER**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the Court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

DUANE A. EVANS
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

*Sam Stagias (by NDM)*
SAMANTHA E. STAGIAS
KELLY Z. WALTERS
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice

NICHOLAS D. MOSES
Assistant United States Attorney

New Orleans, Louisiana
September 29, 2023

No. _____

# United States District Court
## FOR THE
### EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

vs.

ALEX LEV GLOTSER

**BILL OF INFORMATION FOR HEALTH CARE FRAUD**

Violation(s): 18 U.S.C. § 1347

Filed _____, 20 23

_____, Clerk.

By _____, Deputy

NICHOLAS D. MOSES
Assistant United States Attorney